UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 09-61168-CIV-COHN-SELTZER

AMERICAN GUARANTEE & LIABILITY
INSURANCE COMPANY, a Foreign
corporation,

       Plaintiff,

vs.

JOHN CASCOE and JOAN CASCOE,

       Defendants.
_____/

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court on Plaintiff's Motion for Final Summary Judgment [DE 30] ("Motion"). The Court has considered the Motion, the parties' related submissions, the argument of counsel on May 12, 2010, the record in this case, and is otherwise advised in the premises.

### I. BACKGROUND

Plaintiff seeks a declaratory judgment that the insurance policy it issued to the law firm Estime-Thompson, P.A. ("Firm") is void *ab initio* because of material misrepresentations and prior knowledge regarding potential claims. The Firm consisted of two partners, Marie Estime-Thompson ("Estime") and Ruben Thompson, and a paralegal, Patricia De Pons. Ms. Estime and Mr. Thompson declare that they did not make any knowing misrepresentations in obtaining the policy because they, themselves, were defrauded by the actions of their rogue employee, Ms. De Pons.

1.  **Failed Land Purchase**

Defendants obtained two judgments against the Firm and have sought to garnish the policy proceeds in satisfaction of those judgments. Defendants' judgments arise out of a transaction to purchase land that went south and resulted in the Defendants losing their deposit. In early 2006, the Firm took on the representation of First Loan Solutions ("First Loan") in connection with a plan to purchase 1200 acres of property from John W. Cruce Trust and J. Adam Cruce Trust (collectively "Cruce Trust"). In April and May of 2006, the Firm wired to attorneys for Cruce Trust a total of $700,000 as a non-refundable deposit towards the purchase. Thereafter, First Loan failed to close on the purchase. On June 1, 2006, Cruce Trust's attorneys informed Ruben Thompson that the $700,000 would be released to the trust.

During this same period, the Firm was conducting "false closings" where First Loan was purporting to sell the Cruce Trust property. The closings took place from April 2006 through June 2006 and again in August 2006. The Firm used the money obtained in these false closings to make the non-refundable deposits to Cruce Trust. The purchasers in the false closings, however, did not authorize such use of their money. For example, the Cascoes claim that they deposited approximately $90,000 with Act Title and that their money was transferred to the Firm's escrow account and then improperly disbursed from the account after a false closing in the summer of 2006. From May 26, 2006 through October 2, 2006, several attorneys wrote letters and made calls to the Firm demanding proper documentation for the false closings, demanding return of monies, and threatening legal action.

## 2. Ms. De Pons - The Rogue Employee

Beginning in the summer of 2004, the Firm operated as an agent of Attorney's Title Insurance Fund. The Firm, through the title company, would close real estate transactions. Ms. De Pons was in charge of the day-to-day activities of the title operation. Unbeknownst to Ms. Estime and Mr. Thompson, Ms. De Pons registered International Title and Trust as a fictitious name in the summer of 2005. Ms. De Pons took this step before the Firm ever approved the formation of the title company and to absorb the title function maintained by Ms. De Pons' previous employer.

It was through the activities of the title company that Ms. De Pons came into contact with Daniel Stephen, the owner of First Loan. This lead to the Firm's representation of First Loan in connection with the transaction described above. Ms. Estime and Mr. Thompson, however, were unaware that Ms. De Pons and Mr. Stephen had already executed sales contracts with prospective purchasers for land without proper title. Nor were Estime and Thompson aware that Ms. De Pons had an interest in First Loan and the real estate transactions.

Mr. Thompson had primary responsibility for the representation of First Loan. It was his understanding that no real estate transfers or sales from First Loan Solutions were to take place until after that entity had itself acquired title to the entire parcel of land from the Cruce sellers. During 2006, Mr. Thompson was reassured by Ms. De Pons and Mr. Stephen that the land purchases were moving forward and that First Loan had sufficient funds to proceed to closing.

Until January 2007, the Firm and the title company operated out of separate offices. Prior to this, neither Ms. Estime nor Mr. Thompson maintained an office at the

title company. Both Ms. Estime and Mr. Thompson declared that any mail related to the title company which arrived at the Firm's office would be automatically re-routed to the title company and Ms. De Pons. In addition, they both stated that they did not preview any of the title company's correspondence and relied entirely upon information provided by Ms. De Pons.

**3.     The Policy**

In October 2006, the Firm applied for a professional liability policy with American Guarantee & Liability Insurance Company ("American Guarantee"). In her application, Estime represented that neither she nor Thompson were aware of any circumstances, incidents, acts, errors or omissions that could result in a claim against the Firm, Estime or Thompson. American Guarantee ultimately issued a professional liability policy of insurance to the Firm for the period October 6, 2006 to October 6, 2007 ("Policy"). DE 31 ¶ 1.

> The Policy contains the following condition precedent:
>
> It is a condition precedent to coverage under this policy that the act or omission [that leads to a claim] occurred:
>
> 1.     during the **Policy Period**; or
>
> 2.     prior to the **Policy Period**, provided that all of the following four conditions are met:
>
>    a) the **Insured** did not notify any prior insurer of such act or omission or **Related Act or Omission**; and
>
>    b) prior to the inception date of the first policy issued by the **Company** if continuously renewed, no Insured had any basis (1) to believe that any Insured had breached a professional duty; or (2) to foresee that any such act or omission or **Related Act or Omission** might reasonably be expected to be the basis

>  of a **Claim** against any Insured;
>
>  . . .

Policy at § I.A.   The Policy defines the Insured to include:

> any other person who is employed by the **Named Insured** as a legal secretary, paralegal, contract attorney or other legal office staff member, but only in rendering or failing to render **Legal Services** on behalf of the **Named Insured** and also only with the scope of such employment or retention agreement;

Id. at § G.6.

On October 6, 2006, Estime filled out an "Application For A Claims-Made And Reported Lawyers Professional Liability Policy" ("Application"). Estime listed herself and Thompson as the only attorneys in the Application in response to "Question 1." In addition, the Application contained the following question:

> During the past five (5) years, has any professional liability claim or suit been made against any attorney named in Question 1 OR is any attorney named in Question 1 aware of any circumstances, incidents, acts, errors, or omissions which could result in a professional liability claim against the firm, any attorney of the firm, or its predecessors?  If YES, provide full details on a Supplemental Claim Information form.

In response, Ms. Estime answered "No."  The Application also contained the following notice:

> Failure to report the following to your current insurance company BEFORE policy expiration may create a lack of coverage:
>
> 1.   Any claim made against you during your current policy term; or
>
> 2.   Any facts, circumstances or events which may give rise to a claim.

Further, on the same day, Ms. Estime executed a "Claim Supplemental Application"

5

which states that the "form only needs to be completed if you or your firm has been sued within the past five years or if you have a reasonable basis to believe that you or anyone in your firm has committed an act, error or omission that may lead to a suit." The Claim Supplemental Application does not list any claims or potential claims. Finally, the Claim Supplemental Application states that "[t]he applicant represents that the above statements are true and correct to the best of his or her knowledge and that no material or relevant facts have been suppressed or misstated and agree that the policy, if issued, will be issued on the reliance of such representations."

**4.    Procedural History**

In June of 2007, the Cascoes filed a complaint in state court against the Firm and its attorneys for breach of fiduciary duty and negligence. American Guarantee assumed the defense of the Firm and its attorneys but reserved the right to dispute coverage. On July 2, 2008, the state court granted summary judgment in favor of the Cascoes and awarded them $92,500 in damages. On July 10, 2009, the state court entered final judgment awarding costs in the amount of $33,561.70. The Cascoes have attempted to garnish the Policy based on these two final judgments. The state court stayed the garnishment proceedings pending this lawsuit.

On June 6, 2008, American Guarantee filed a complaint in federal district court for a declaratory judgment that the insurance policy issued to the Firm was void *ab initio*. Although the court granted Estime and Thompson additional time to respond to the complaint, neither they nor De Pons filed an answer. Accordingly, the clerk entered a default against Estime, Thompson and De Pons.

The Cascoes filed a motion to intervene as a matter of right on the basis that

they were a third-party beneficiaries of the Policy because they held state court judgments against the Firm. In an unpublished decision, the district court denied the Cascoes' motion because they failed to establish that they had a "legally protectable right in the Policy." In denying the motion, Judge Ungaro found that the Cascoes' claim was "purely economic" and that the "underlying claim in [the declaratory] action – voiding an insurance contract because of alleged material misrepresentations – [was] in no way related to the interests of [the] Cascoes [ ] – prospective collectability of a debt."

The Eleventh Circuit affirmed on June 10, 2009. The court found that "a declaratory judgment against [the Firm] does not impair the Cascoes' ability to litigate whether the misdeeds of [the Firm] were covered under the insurance policy issued by American Guarantee. Because their interest . . . is purely economic, the district court did not err by denying the Cascoes' motion to intervene."

### 5.  Motion for Summary Judgment

Plaintiff filed the instant Motion arguing that there are undisputed facts which preclude coverage for the judgments obtained by Defendants. At a hearing on May 12, 2010, Plaintiff's counsel acknowledged that there are disputed issues of material fact concerning certain arguments raised in Plaintiff's Motion for Summary Judgment. Notwithstanding, Plaintiff argued that the undisputed facts show that the Policy does not provide any coverage for Defendants because (1) Mr. Thompson had a basis to believe an insured had breached a professional duty; and (2) the Defendants' judgments fall outside the Policy's damages definition.

Defendants opposed both arguments. In addition, Defendants argued that the state court garnishment proceeding prevents the Plaintiff from arguing that the Policy is void.

## II. LEGAL STANDARD

The Court may grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "When deciding a motion for summary judgment, a district court must consider all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion and must resolve all reasonable doubts against the moving party." Corbitt v. Home Depot U.S.A., 573 F.3d 1223, 1238 (11th Cir. 2009). The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

After the movant has met its burden under Rule 56(c), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). According to the plain language of Rule 56(e), the non-moving party "may not rely merely on allegations or denials in its own pleading," but instead must come forward with "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 587.

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911

8

F.2d 1573, 1577 (11th Cir. 1990). If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).

### III. ANALYSIS

**1.   Policy's Condition Precedent**

Under the circumstances of this case, the Policy expressly provides as a condition precedent to coverage that "no Insured had any basis to believe that any Insured had breached a professional duty . . . ." Policy at § I.A(b). Plaintiff argues that Mr. Thompson's sworn testimony taken on December 18, 2007 establishes that Thompson was aware that he had breached a professional duty. At the hearing, Plaintiff focused the Court's attention on a specific section of Mr. Thompson's examination. Plaintiff first highlighted a point in the examination where Mr. Thompson confirms that by May of 2006, Thompson had wired on at least three occasions funds totaling approximately $1.2 million. DE 49-4 at 184:24-185:2. Next, Plaintiff points to the following excerpt:

> Q.   Does anybody give you written authorization to release escrow funds without having title in First Loan Solutions? Any of these buyers?
>
> A.   In the LLC the agreement they authorize FLS to be the manager and to facilitate that purchase.
>
> Q.   Okay. Does that authorize your office to break escrow.
>
> . . .
>
> A.   What do you mean by break escrow?
>
> Q.   Release escrow funds.
>
> A.   The agreement authorizes us to do it upon notification to First Loan Solutions that the closing is going to occur, that we're authorized by

9

| | |
|---|---|
| | them to release the funds. |
| Q. | Perfect. Where is the written authorization from First Loan Solutions? |
| A. | It doesn't say that it's specifically a written authorization. It says that we're ready to close. The communications between our office and the seller's office would indicate that, okay, we are ready to go. |
| Q. | Okay. Where is -- So in other words, there's nothing in writing anywhere? |
| A. | I don't know that. |
| Q. | Well -- |
| A. | The documentation that's submitted to our attorney, it may be contained in that documentation. |
| Q. | As you sit here today, do you recall seeing anything in writing that said -- You're a real estate attorney, or you were at the time. Did you have a proposed HUD from the seller in Madison County? |
| A. | A proposed HUD? |
| Q. | A closing statement. |
| A. | I understood that we were ready to close. I was told that we were ready to close. |
| Q. | It's really -- I understand your position. At this point though, it's just a yes or no. Did you have -- |
| A. | No, I did not -- No, I did not see one. Whether or not we have one, it would be -- we could go to the files to determine if we had one in this file or there's one in the files. |
| Q. | Would you agree with me though that if that communication occurred in June 2006 the three prior wires out occurred before being told you're ready to close? |
| ... | |
| A. | I would agree that they occurred before -- There were wires out that occurred before. The final wire was to be done prior to the closing as well, which would have concluded the transaction. |

<u>Id.</u> at 187:12-189:17.

10

Drawing all inferences in favor of the non-moving parties, the Court concludes that the above testimony does not present undisputed evidence that, prior to October of 2006, Mr. Thompson had "any basis to believe that any Insured had breached a professional duty . . . ." Policy at § I.A(b). First, within the cited exchange, Mr. Thompson stated that: "I understood that we were ready to close. I was told that we were ready to close." Second, as Defendants argued at the hearing, when Mr. Thompson provided his 2007 testimony, he did so with the benefit of hindsight. In opposing Plaintiff's Motion, Defendants submitted the Affidavit of Ruben Thompson [DE 38-1] in which he states that he did not know anything was amiss with the real estate transactions until January of 2007. Mr. Thompson's Affidavit contains the following statements:

- "I was clear and emphatic in my [December 18, 2007] testimony that I did not have knowledge of any actual or potential claims that had or could have been asserted against me, the law firm, or its attorneys, that would entitle the insurer to deny or cancel coverage based upon alleged misrepresentations on the October 6, 2006 insurance application." DE 38-1 ¶ 5.

- "At no time prior to January 2007 was I aware that Ms. De Pons was abusing her trust by surreptitiously proceeding with false closings of sales of the acreage and that had not yet been acquired by First Loan Solutions." Id. ¶ 20.

- "I was not aware that on June 1, 2006 the sellers of the Martin County property had allegedly declared a default on the purchase contract. In speaking with Ms. De Pons and Mr. Stephen throughout the fall of 2006, they represented that the sale transaction was viable and renegotiation for a lesser sale was ongoing due to the discovery that 300 of the 1500 acres were wetlands. At all times, I was told that First Loan Solutions had sufficient funds to proceed to closing." Id. ¶ 21.

- "Had I or my wife been aware that the Cruce land purchase was in jeopardy due to misappropriation by Ms. De Pons or Mr. Stephen we would not have proceeded to wire out the $500,000 on May 17, 2006." Id. ¶ 23.

- "It was not until January 2007, after I fielded a complaint from a purchaser [ ] who sought a refund, that I learned that Mr. Stephen and Ms. De Pons had used the title company to proceed to use a HUD1 to what Ms. De Pons

11

described as a preliminary closing (false closing) of the Martin County land prior to having title to convey." Id. ¶ 24.

Based on the record before this Court and the controlling legal standard, Plaintiff fails to establish that no reasonable juror could find in favor of Defendants on the issue of whether the Policy's condition precedent contained in § I.A(b) was satisfied.

### 2.   Policy's Definition of Damages

The Policy defines damages as "the monetary portion of any judgment, award or settlement, . . . ." Policy at § E.  The Policy expressly states that damages do not include, *inter alia*, "personal profit or advantage to which the Insured was not legally entitled" or "legal fees, costs and expenses paid to or incurred or charged by the Insured, no matter whether claimed as restitution of specific funds, forfeiture, financial loss, setoff or otherwise, . . . ." Id. at §§ E.3 and E.7.  Plaintiff argues that "the Cascoes seek to recover their two judgments – one for disgorgement of escrow funds that were improperly disbursed and a second for costs incurred in the underlying lawsuit.  The exclusion for return of fees, costs and expenses is clear and unambiguous and precludes coverage for the Cascoes' cost judgment as well as escrow judgment." DE 30 at 7.

Several courts have found that insurance policies similar to the one at issue do not cover judgments which are "properly characterized as restitutionary rather than compensatory in nature." Jaffe v. Cranford Ins. Co., 168 Cal. App. 3d 930, 935 (Cal. App. 4th Dist. 1985) ("The defendant is asked to return something he wrongfully received; he is not asked to compensate the plaintiff for injury suffered as a result of his conduct."); Level 3 Communs., Inc. v. Fed. Ins. Co., 272 F.3d 908, 911 (7th Cir. 2001) (holding that an award which "seeks to deprive the defendant of the net benefit of the

unlawful act" was not covered by policy). Moreover, "[r]estitution is not limited to money wrongfully acquired . . . ." Republic W. Ins. Co. v. Spierer, Woodward, Willens, Denis & Furstman, 68 F.3d 347, 352 (9th Cir. 1995). For example, "[m]oney can be lawfully acquired yet restitution can be owed, because of unjust enrichment and unjust impoverishment." Id.

Plaintiff points out that a "federal court applying Florida law recently held that a claim to recover funds deposited in a firm's escrow account fell outside the policy definition of damages in Chong v. Medmarc Cas. Ins. Co., No. 8:08-cv-1239, 2009 WL 4855737 (M.D. Fla. Dec. 10, 2009)." DE 48 at 4. Plaintiff cites the Chong decision for the following proposition:

> Plaintiff's clients' rights to their money being held in Plaintiff's trust account were not altered by the fraud perpetrated on Plaintiff and the erroneous transfer of the trust account funds. Any suit to recover these funds would have been more restitutionary in nature, and recovery of these funds would not be characterized as compensatory damages stemming from an act or omission of Plaintiff. In other words, Plaintiff's clients' rights to their money was not contingent on an act or omission on the part of Plaintiff in rendering professional services.

Id. at *4. Accordingly, Plaintiff argues that "the Cascoes are also seeking to recover monies deposited with Act Title that were allegedly transferred to the firm's trust account. As in Chong, the nature of the damages, not the specific cause of action under which they prevailed, dictates the result." DE 48 at 4. Therefore, Plaintiff contends that there is no coverage for the Defendants' judgments under the Policy.

The case before this Court can be distinguished from the authority cited above. First, the Firm was not ordered to pay Defendants for funds which the Firm unlawfully retained. Here, the Firm did not retain the Cascoes' deposit. In other words, the Firm is not being asked to simply return money, rather the judgment requires the Firm to

13

compensate the Cascoes for money which was lost.  Second, in Chong, the court reasoned:

> Unfortunately, Plaintiff was a victim of fraud, but the professional liability policy provided by Defendant was not intended to cover such a loss by Plaintiff.  Accordingly, the Court finds no coverage under the policy because there have been no negligent acts or negligent omissions resulting from the performance of, or failure to perform, professional services.

Chong, 2009 WL 4855737 at *4.  "Any suit to recover these funds would have been more restitutionary in nature, and recovery of these funds would not be characterized as compensatory damages stemming from an act or omission of Plaintiff." Id. Conversely, in this case the Defendants obtained a judgment based on claims for breach of fiduciary duty and negligence against the Firm.  Rather than an innocent victim of a fraud committed by a third party, the Firm was found to be negligent in failing to protect against a fraud committed by one of its own employees.  Accordingly, the Court finds that the Policy does not exclude the judgment awarding Defendants $92,500 in damages.

Defendants, however, did not present any argument regarding the $33,561.70 judgment awarding costs.  The Court finds that this judgment falls outside the Policy's definition of damages which excludes "legal fees, costs and expenses . . . charged by the Insured . . . ." Policy at § E.7.  Therefore, summary judgment will be granted in favor of the Plaintiff with respect to the second judgment.

3.    **Garnishment Proceeding**

Defendants argue that Plaintiff's liability to Defendants arose as of the Cascoes' July 2, 2008 judgment against the insureds and was further fixed when the Cascoes served Plaintiff with a writ of garnishment.  Therefore, Defendants claim that Plaintiff

14

may not seek to undo its liability by "collaterally and belatedly rescinding the insurance policy as to the Cascoes." DE 36 at 7.

Plaintiff contends that Defendants' argument lacks merit. Plaintiff states that "Florida garnishment law clearly and unequivocally provides that a garnishor (the Cascoes) steps into the shoes of the judgment debtor (the Firm) and cannot take anything more than the judgment debtor could obtain directly from the garnishee (American Guarantee)." DE 48 at 5. Plaintiff cites the Florida Supreme Court in support:

> Judgment creditors derive their right to proceed against a garnishee only by virtue of the fact that the garnishee holds money or property owed to the judgment debtor. Trial judges should exercise their discretion in such a way as to insure that the judgment creditor receives no greater rights against a garnishee than would have been available to the judgment debtor in a proceeding against the garnishee.

United Presidential Life Ins. Co. v. King, 361 So. 2d 710, 713 (Fla. 1978); see also Alejandre v. Telefonica Larga Distancia de P.R., Inc., 183 F.3d 1277, 1286 (11th Cir. 1999) ("Florida law provides that when a plaintiff holding a judgment serves a writ of garnishment upon a garnishee, the plaintiff steps into the shoes of the judgment debtor and can assert only the rights that the judgment debtor could have asserted against the garnishee.").

Plaintiff argues that "it is unquestionable that American Guarantee obtained a default final judgment against Estime-Thompson, Thompson, the firm and De Pons prior to the issuance of any writ of garnishment. Thus, at the time the writs were issued, American Guarantee owed nothing under the policy. There was nothing to take via garnishment." DE 48 at 5. The Court agrees with Plaintiff. In affirming the denial of Defendants' motion to intervene, the Eleventh Circuit found that "a declaratory

judgment against [the Firm] does not impair the Cascoes' ability to litigate whether the misdeeds of [the Firm] were covered under the insurance policy issued by American Guarantee." Accordingly, Defendants must establish that the circumstances which resulted in their judgment are covered by the Policy. Defendants did not accomplish this merely by obtaining writs of garnishment.

## IV. CONCLUSION

Based on the foregoing, it is hereby **ORDERED AND ADJUDGED** as follows:

1. Plaintiff's Motion for Final Summary Judgment [DE 30] is **GRANTED in part and DENIED in part**.

    a. Plaintiff's Motion is **GRANTED** with respect to the argument that $33,561.70 judgment in costs is not covered by the Policy.

    b. Plaintiff's Motion is **DENIED** with respect to all remaining arguments.

2. Counsel for the parties shall appear for Calendar Call at **9:00 a.m. on Thursday, May 27, 2010**.

    **DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, on this 15th day of May, 2010.

*/s/ James I. Cohn*
JAMES I. COHN
United States District Judge

Copies provided to:

Counsel of record via CM/ECF